JOHN R. SMITH and another *v.* WILEY B. FORT.

Where one is sued alone upon a verbal contract, and the evidence on the trial tends to show that the contract was made with the defendant and another person, it is error in the Court to leave it to the jury to say whether there was a sale to the defendant alone, and the defendant is entitled to a new trial.

CIVIL ACTION, tried before his Honor, *Judge Buxton,* at the Special (January) Term, 1874, of the Superior Court of WAYNE county.

The case as settled by his Honor, (the counsel disagreeing thereon,) is substantially as follows:

The plaintiffs were owners of a steam saw mill and fixtures, which, on the 26th Nov., 1868, they contracted to sell to the firm of Jenkins & Southard for the sum of $1,500, secured by three notes of $500 each, due respectively at 3, 6 and 9 months from 26th Nov., 1868, with interest. According to the contract, which was in writing, the vendees were placed in possession, but the title was retained by the vendors, until payment in full. After a number of payments, which were entered as credits on the notes, reducing the principal to about one half of the original amount, Jenkins & Southard parted with their interest in the mill and fixtures to one Ballinger, and put him into possession.

*Rufus Edmundson,* one of the plaintiffs, testified: That on the 1st September, 1871, the defendant came to him in Golds boro', and remarked that he had come to buy our saw mill. Witness asked him, if he proposed to take the position occupied by him and his partner, Smith, the other plaintiff, towards Jenkins & Southard in regard to title. Defendant said that he did. Witness then said that he and partner wanted to sell. Defendant answered that if the amount was not more than he understood it was, he would buy. Witness told him that the amount due upon the sale notes was not exceeding $900, and he thought it would be less. He, the defendant,

then said that he and one Yelverton had agreed to buy, and that he had come up for that purpose, and to raise the mortgage, if there was no more due upon it than he heard there was. Witness asked Fort what he proposed to do if he and Yelverton purchased the mill. His answer was, that they were going to buy it for Ballinger and wanted it to remain where it was—the place where Ballinger was then running it. To this witness replied that it would suit them (he and his partner) exactly, as they wanted to have some timber cut. He then handed defendant, Fort, the papers, and told him " *There are the contract and notes, the mill is yours,*" saying further, that it might possibly require a written transfer on their part, but to go and consult a lawyer. As to payment, the defendant said that if we insisted on it, he would pay part that day, though it would be inconvenient, and he prefered to get his cotton out first ; and on being asked when he would be ready he replied in October next.

On the same day witness again saw defendant at the law-office of Mr. Faircloth, and told him that his partner (the plaintiff Smith) was not at home, in consequence of whose absence the witness would not be able to get the exact amount of the credit on the notes, some of which had not been endorsed, and the amount of which Smith had. Witness and defendant agreed to leave the paper, with Faircloth, and ascertain from Smith the amount of credits. This was on Tuesday, and Fort remarked that he and Yelverton would be there on Friday or Saturday following to complete the settlement. Fort did not come either on Friday or Saturday, and on the Sunday following the mill was burned.

The witness further stated that some ten days afterwards, or perhaps more, he saw Fort and he told witness that Yelverton was disposed to back out, but that if he was bound, Yelverton was too, and that he, himself, would not go back on his word for that amount. Witness saw him two or three times afterwards, and was informed by him that we would have to sue, as Yelverton would not pay.

Upon his cross-examination this witness further stated : That the papers were taken to lawyer Faircloth to see if a written transfer was necessary to pass the title. When witness passed the papers the defendant took them and said nothing. It was at the suggestion of the witness that they went to Faircloth.

Being re-examined the witness stated that the land on which the mill stood did not belong to him and his partner. Witness did not know how the papers got into the hands of his counsel.

The witness further stated that there was a bill of lumber sawed for the defendant before the sale, the amount of which he has since paid to Smith. There was an arrangement between Smith, Fort and Ballinger that the amount was to be credited on the notes.

The papers, contract and notes were then exhibited, the witness stating that he and his partner, the co-plaintiff, had endorsed a written transfer to the defendant and Yelverton on the contract, and had also endorsed the notes without recourse. This may have been done since the mill was burned, but the witness did not think it was. The credits have also all been endorsed.

*John R. Smith,* the other plaintiff, testified : That the first conversation he had with the defendant was some eight or ten days after the mill was burned. The defendant, Edmundson, the co-plaintiff and himself met in front of the Sheriff's office, and defendant remarked that he was out of the trade. Upon being asked why, he said that Yelverton had sent word that he would not take the mill. The plaintiffs told him that they had heard nothing of it, and they had made the transfer. An hour or two later the same parties met again in the office of the Sheriff, when Fort remarked that he would still stick up and pay for the mill, that he would rather loose $1,000 than falsify his word.

At the next Court witness further stated that the defendant seemed willing, but said that Yelverton held a right to Jenkins' land, and he (Fort) was afraid Jenkins would burn him up, unless Yelverton came into the trade, and Yelverton

seemed disposed to back out. Witness said that Yelverton told him he never agreed to buy the mill in company with the defendant, but only agreed to go security for him. This the witness told Fort, the defendant, who said that Yelverton had so agreed and could not get out of it that way. The plaintiffs told the defendant that they had no claims on Yelverton, as the contract was made with himself.

Witness also stated that he had made a calculation and found that there was due on the notes, 1st Sept., 1871, the sum of $895.92. The notes witness found at Faircloth's office ; and the transfer was made during that week and signed by the plaintiffs. It was made before Sunday. The papers remained with Mr. Faircloth, and the witness has never had possession of them since that time.

In May, 1871, defendant came to witness and told him that he wanted a bill of lumber sawed, and as he and Jenkins were not on good terms, he wanted the witness to get the lumber sawed. Witness and his partner spoke to Jenkins about the matter, and he agreed to saw the lumber. The defendant gave witness the bill and it was sawed, and he paid witness for the same in 1871, after the trade, by crediting the sum, to wit: $116.50 on the $895.92 the price of the mill, &c., remaining unpaid.

Witness authorized Edmundson to sell the mill ; did not know on whose land it stood.

Cross-examined, the witness stated that he received a letter from Ballinger informing him that the mill was burned. The witness had signed the transfer before he heard that the mill was burned. Witness and his partner owned the mill together. The agreement was, that the defendant was to pay the balance due on the notes. The defendant had informed the witness that Ballinger claimed the amount he owed for sawing the bill of lumber before spoken of, and as the plaintiffs also claimed it, requested that they would warrant for it. This was done, and the plaintiffs obtained judgment, Ballinger being present.

The transfer was signed the same day it was drawn by the

lawyer.   No money passed and no notes were given;   the transfer was made to Fort and Yelverton, and the defendant wanted the present suit to be brought against himself and Yelverton.

*Ballinger*, a witness for the plaintiffs, testified that he was in charge of the mill, and went to defendant, Fort, and asked him to raise the mortgage or lien held by Smith and Yelverton, promising, if he would do so, that he would give him the amount of the bill for sawing his lumber.   Defendant promised that he would see Yelverton and let the witness know. He did so, and told the witness that he would, saying that he would go to Goldsboro' the next evening and attend to it.   On his return from Goldsboro', the defendant informed the witness that he had seen Edmundson and had arranged the matter; that it would be all right, and they were going down on next Saturday to sign the papers.   He said it would have been fixed up, but Smith was not there to sign them; that it was all right and that he, the witness, could go right on, as the papers would be fixed the next Saturday.   Defendant told witness he had travelled rapidly to Goldsboro', changing horses on the way at Coley's.

The bill of lumber spoken of was sawed for defendant before his contract with Smith and Edmundson.

Upon his cross-examination the witness said:  He had bought the mill from Jenkins, and had it in operation until the Saturday, 12 M, before it was burned on Sunday.   Witness sawed defendant's lumber at the request of Smith.   He was running the mill from Tuesday up to Saturday; the defendant got some lumber after witness repaired the mill; this was another little bill given to witness by Fort afterwards.

The defendant used the words, "it is all right, go ahead, it is fixed, or will be fixed, next Saturday."   He mentioned no price.   Witness wanted to get the money for sawing the defendant's lumber to help repair the mill.

For the defendant, he himself first testified:   On Tuesday, 1st of September, 1871, witness met Edmundson at the store

of one Kornegay, in Goldsboro', and stated to him that he had come up to purchase the mill if his lien or mortgage upon it was not more than he heard it was. Edmundson had proposed to sell it to him before. He, Edmundson, pulled the contract papers out, and handing the same to him, suggested a meeting at the office of Mr. Faircloth for the purpose of examining them. They did so, but after consultation and upon the suggestion of Mr. Faircloth, postponed the matter until Saturday, when all the parties could be present, Smith being absent. Witness did not recollect that Edmundson told him that the mill " is yours." Witness had not heard the papers read until the trial. Edmundson said there had been some payments on the papers, which Smith knew of. Witness did not mention to him what he understood the amount due to be. Edmundson asked of lawyer Faircloth if he could transfer the title to the mill. Faircloth examined the papers and expressed the opinion that it could be done.

Witness told Edmundson that he and Yelverton wanted to buy. Edmundson said he did not know how much is due, and witness never heard how much was due until after the mill was burned. Edmundson said he would wait awhile for the money if it would be an accommodation. Witness went home and communicated to Yelverton what had taken place. On the Sunday following the mill was burned.

In regard to the bill of lumber Smith told the witness that he could arrange it so that it could go on the mortgage. Witness gave him the bill and Ballinger sawed it; he afterwards offered to pay Smith for the bill, but he said there was no use for him to receive it, as the mill was the witness's. Ballinger and Jenkins claimed the price of the lumber afterwards, and of this witness informed Smith, who told him to come to the court house and he would warrant him Witness accepted service of the summons and notified Ballinger. All met at the trial, and Ballinger agreeing that the price might go on the mortgage, witness gave Smith an order for the money, which was paid.

Witness further stated that Smith spoke of bringing suit and also of leaving it to referees. Edmundson stated to witness that he did not recollect the exact amount due on the note; witness did not recollect that Edmundson said he would guaranty the amount should not exceed $900. Jenkins was in Goldsboro' the day witness had the conversation with Edmundson.

Cross-examined, the witness said: That he was brought to Goldsboro' that day by Jack Barden, and he told him to bring him as soon as possible, as he wanted to see Edmundson before Jenkins did. Witness made arrangements to get money from one Day in the event he purchased the mill, and informed Edmundson that he could pay a part of the amount on that day; he also told him that he had a race to get there before other men. Edmundson mentioned an amount which the mortgage would not exceed, but witness does not recollect that amount; he went to Faircloth's office to ascertain as to the title and to find out from Smith the amount yet due. Witness did not return to Goldsboro' on Friday or Saturday, nor did he request Smith to warrant him for the bill for sawing, &c., as he had offered to pay him after the mill was burned.

Ballinger gave witness a receipt for the amount, and directed it to be credited on the amount. Witness made the remark that he would pay $1,000 rather than forfeit his words, and he is still of the same sentiment. Witness told Smith that Yelverton would not pay, and of course he would not; that Yelverton had backed out, and so had he. He did not tell them to see Yelverton; may have remarked that they would have to sue before they got the money. After the fire Ballinger tried to repair the mill, but gave it up as a bad job, and rented out a part of it.

The witness (the defendant) upon the direct examination being resumed, stated that Ballinger was running the mill when he had the lumber spoken of sawed. That he never invited this suit; but said if they got the money it would be by suit. Witness always denied completing the contract; the

4

plaintiffs insisted that he had bought the mill ; he insisted that he had not; he made arrangements with Day to get money on Saturday in case he needed it.   At the back of the sheriff's office, witness told Smith that Yelverton refused to buy the mill; and he further told him that he could not see how the plaintiffs could transfer the property in his and Yelverton's absence, and then sue him and leave out Yelverton.

*William T. Faircloth,* for defendant stated :   Edmundson and Fort came to his office on Tuesday, 1st September, 1871. After talking in a friendly way for some time, they called upon me to know whether they could transfer title to the property and papers without the transfer being in writing.   He informed them it could be done, but advised that it should be in writing. They asked if Edmundson and Smith should both transfer ; witness answered, as they were partners, either could, but again advised that both should sign the transfer.   The parties then fixed on Friday or Saturday following, when they would meet again, the defendant bringing Yelverton, and Edmundson, Smith, the latter not being present at the first conference.

Witness wrote the transfer some time in September, 1871 ; the parties signed it in his presence ; he omitted to insert the day of the month, with a purpose, which purpose he did not draw to their attention.   The best impression of the witness was, that the transfer was written and signed during that week. The papers were left with him to be kept until Saturday. Witness gave the papers to the plaintiffs or to their attorney; after both sides told him that they had disagreed.

*Thomas Yelverton* testified that he was in company with Jenkins after Fort had returned from Goldsboro': he rode up, and Jenkins asked him, " Have you bought that milll ?"   Fort said nothing, and Jenkins asked, " Did you pay any money ?" Fort made no reply, but rode off eight or ten steps, called me to him and said :   " I have not bought the mill, but I have got it fixed so that I can get her if we want her.   Edmundson gave me the papers, which I gave to Faircloth ; Smith was

not there; the matter was postponed, and we are all to meet down there on Saturday."

Cross-examined, witness said that it was the Wednesday after the Tuesday when he saw Fort as he was passing. He and Jenkins were not friendly ; the mill was burned on Sunday. Fort did not tell him what he was to pay for the mill ; neither of them went to Goldsboro' on Saturday. Fort never asked him to pay any amount, and the witness did not know exactly how he wanted to use his name. Witness told Smith that he had agreed that Fort should have the use of his name, and that he thought he wanted it as security.

*Mr. Jenkins* testified that Ballinger fixed up the mill a little after it was burned, and sawed a little and quit. A part has been moved away.

His Honor charged the jury.:

The plaintiffs claim (1) that the defendant bought the mill and has not paid for it ; and if this is not so, then, (2) the defendant agreed to buy the mill, and violated his agreement.

On the other hand the defendant insists that he merely wanted to buy the mill if it could be bought on satisfactory terms, but that he neither bought it nor agreed to buy it.

1. Whether there was a sale or not is a question for the jury to determine as they shall gather the intention of the parties, not the intention of one only, but of both. Upon a completed sale the property passes to the purchaser, and conversely, if the property passes the sale is complete. The property does not pass absolutely unless the sale be completed, and it is not completed until the happening of any event expressly provided for.

As between the parties property may pass by a sale without delivery of possession, if it is so agreed between the parties. If the property passes without a change of possession, and the thing sold perishes, the loss falls on the purchaser, for it is his property.

In regard to the price, it must be certain, or capable of being made so by reference to a definite standard. It may be payable in the future if the parties so agree.

2. An agreement to sell is a different thing from a sale, and therefore no mere promise to sell hereafter amounts to a present sale. Where there is no sale, but merely an agreement to sell, and the property perishes, the loss falls on the owner, and not on the proposed purchaser.

These are the general principles of law applicable to the case. It is for the jury to apply them according as they shall find the facts.

(1.) If the jury shall find from the evidence that it was the intention of both parties at the interview between Edmundson and Fort, on Tuesday, 1st September, 1871, that the title of the property should pass to Fort at once, and he was to pay for it the balance due upon the notes of Jenkins and Southard, to be ascertained by calculation afterwards, the amount not to exceed $900, then the plaintiffs would be entitled to a verdict for the price agreed to be ascertained by such calculation.

(2.) If the jury shall find from the evidence that there was no sale effected on Tuesday between the parties, but that Fort then agreed to buy and to return on Friday or Saturday and complete the purchase, and that he violated the agreement, then the plaintiffs would be entitled to nominal damages, there being no evidence that the property was worth less in marketable value on Friday or Saturday than it was on Tuesday, and the rule being where there was a wrong, but no injury, the damages are nominal, and in such cases the verdict should be for a sixpence.

(3.) If the jury shall find from the evidence that there was no sale and no agreement to purchase, and all that was done between the parties was a mere appointment to meet to see whether they could not agree on Friday or Saturday, then the plaintiffs were entitled to recover nothing, and the verdict should be in favor of defendant.

To the foregoing charge the defendant excepted, and asked his Honor to instruct the jury : "That if he, (the defendant,) did not complete the contract he was only liable for nominal damages unless he caused or contributed to cause the destruc-

tion of the property, and that there is no evidence that he either caused or contributed to cause the destruction of the property."

This special instruction his Honor omitted to give, as there was no allegation or insinuation, either in the evidence or the argument of counsel, that the defendant had either caused or contributed to cause the destruction of the property; and his Honor was of opinion that the charge already given covered the principal portion of the instruction. Defendant again excepted.

The jury rendered a verdict for the plaintiffs, finding that there was a sale under a special contract between the parties. Upon the finding a reference was ordered to the clerk to ascertain the balance due after allowing the credits endorsed on the notes, and the further sum of $116.50, the amount of the bill of lumber paid for by defendant.

Rule for a new trial, upon the ground that his Honor erred in leaving the intention of the parties to the jury, when there was no delivery nor ascertainment of the price. And also, in instructing the jury that the measure of damages, in case there was a sale upon the terms contended for by plaintiffs, could be ascertained by a calculation upon the notes to find the balance due upon the original contract of sale between plaintiffs and Jenkins and Southard. Rule granted and discharged. Judgment and appeal by defendant.

*Isler*, for appellant.
*Smith & Strong*, contra.

SETTLE, J. We have frequently had occasion to condemn the practice of sending to this Court a full report of all the evidence adduced upon the trial, but in the case before us, owing to a disagreement of counsel, his Honor has seen fit to do so. And here, at least, it serves a useful purpose, in that we are enabled to correct an error that does not otherwise appear upon the record.

His Honor left it to the jury to say whether or not there had been a sale of the mill and fixtures by the plaintiffs to the defendant Fort, *alone,* when the written transfer made by the plaintiffs, without receiving in return any security, money or other compensation, in the absence of the defendant, (whether before or after the burning of the mill does not clearly appear,) shows that the plaintiffs intended that it should appear that they had transferred the property to Fort and Yelverton jointly.

The evidence for the defendant tends to prove that no contract was executed on Tuesday, but that there was a conversation about a trade to be consummated between the plaintiffs on the one side and the defendant and Yelverton on the other, and that there was an understanding between the plaintiff, Edmundson, and the defendant, that all parties should meet on Saturday, when the price could be ascertained and the contract executed. The evidence for the plaintiff tends to prove that there was a sale to Fort and Yelverton.

The idea of holding Fort *alone* responsible seems to have been an afterthought, not supported by the evidence.

His Honor should have instructed the jury that there was no evidence upon which they could find that Fort alone had bought or contracted to buy the mill and fixtures.

There is error; for which there must be a *venire de novo.*